**Charles H. NATTRESS, Sr., Plaintiff,**

**v.**

**UNITED STATES of America,
Defendant.**

**Civ. No. 3308.**

United States District Court
D. New Mexico.
Aug. 9, 1960.

Smith, Kiker & Kitts, Albuquerque, N. M., by Robert Emmet Clark, Harold O. Waggoner, Charles E. Barnhart, Albuquerque, N. M., for plaintiff.

James A. Borland, U. S. Atty., Albuquerque, N. M., by Herbert Holt, Asst. U. S. Atty., Albuquerque, N. M., Herbert Pittle, Asst. U. S. Atty., Lands Division, Dept. of Justice, Washington, D. C., for defendant.

ROGERS, District Judge.

This is an action brought by Charles H. Nattress, Sr., against the United States of America, praying Judgment in the amount of $19,662.50 with interest, from September 29, 1929, as a part of just compensation for the flooding and consequent taking of plaintiff's property located in the former town of San Marcial, Socorro County, New Mexico, in the months of August and September, 1929. This action was brought November 6, 1956, pursuant to the Act of July 14, 1956, Private Law 767, 84th Congress, Second Session, 70 Stat. A121, and other applicable laws of the United States of America. The effect of the special law was to revive the alleged causes of action after the running of the Statute of Limitations, and gave the owners of property three years from the effective date of the Act, within which to institute such actions. The Act specified seventy-nine individuals owning property in San Marcial, and some forty-three claims have been filed. It was deemed in the best interest, in the administration of justice, that one case be tried fully as to liability, and that the results of this trial would be res judicata or stare decisis as to the remaining claims. The private act also conferred jurisdiction on this United States District Court to try and determine the issues and damages, irrespective of the jurisdictional amount involved.

It might be mentioned at the outset, that the wisdom of Statutes of Limitations and the Doctrine of Laches is well borne out when a Court must project its thoughts back to events which occurred thirty-one years prior to the trial of the cause. With commendable energy and the exercise of great skill, the attorneys, witnesses, specialists and experts accomplished great results in their efforts. The Court feels that from ancient records, reports, geological surveys, testimony of eye-witnesses and presentation of geological and geomorphological evidence, a very accurate picture has been portrayed, even in the face of the elapse of more than three decades.

On February 25, 1905, a dam and reservoir, known as the Elephant Butte Dam and Reservoir were authorized by Act of Congress, 33 Stat. 814, and by the year 1915, steps were taken to fill the reservoir with water. Elephant Butte Dam and Reservoir is located in what is now Sierra County, near the present city of Truth or Consequences, New Mexico. The Dam is approximately forty-three miles from the site of what used to be San Marcial. The river thus dammed and formed into a reservoir, is the Rio Grande, the character of which requires some description. It originates at its headwaters near Wagon Wheel Gap, Colorado. In the northern area of this river, the water is crystal clear and remains relatively crystal clear, having passed over hard rock with little silting, until the confluence of the Rio Grande with the Chama River at Espanola, New Mexico, some twenty miles north of Santa Fe. From this point on, a considerable amount of silt is deposited in the Rio Grande. The silt is augmented by confluences of the Rio Grande with the Galisteo River and the Jemez River. It is well here to state that the river bed, as a result thereof, has in many places been built up higher than adjoining country.

The river is very capricious, and has changed its course many times in the Rio Grande Valley. In Albuquerque, for instance, from the sediments deposited from the tributaries from the Chama River to the Jemez River, the channel has traveled all of the way from a few hundred yards east of the A. T. & S. F. Company right-of-way, to a point some three miles to the west thereof, and has but recently been somewhat channelized with flood preventing construction, so that it has recently, and we hope, will forever be maintained within the confines of the Highway 66 and Barelas Bridges.

As the Rio Grande flows further south, the silting condition is further augmented by the thickly concentrated flowage of silt-laden water from the Rio Puerco and the Rio Salado, which enter the Rio Grande at intervals of about ten miles apart, several miles north of the City of Socorro, New Mexico. The Rio Puerco and the Rio Salado are typical intermittent flowing desert rivers, running completely dry at many times a year, and when heavy rains occur, huge deposits of earth, sand, silt and coarser fragmentations are carried down the channels of these streams into the Rio Grande. This has occurred, of course, from earliest times.

In about the era of 1880, several factors, including the plowing of ground and grazing, coupled with climatic changes, triggered a situation whereby erosion was greatly multiplied. It was at this time that the predecessor of the A. T. & S. F. Railway Company built its tracks from Albuquerque to El Paso. San Marcial was thereafter settled, and it was a Division Point, with Roundhouses, a Harvey House and conventional installations of a railroad center. Dikes were erected by the Railway Company between 1880 and 1895 at a height which the company estimated would protect the railway property. Near San Marcial, it was necessary that the railway cross the river from the west to the east side in a southerly direction. The original bridge was Milepost 1005–A. A second bridge was substituted in about the year 1920,

near Milepost 1006–A. The erection of the abutments and other construction of these bridges had a direct effect of constricting the flow of water past the bridges. South of the bridges, there resulted the conventional delta formations, after the river flattened out.

The river aggraded constantly from at least the year 1895, when measuring devices were installed, up to the time that the reservoir commenced filling, which was approximately January 1915. A thorough study of plaintiff's exhibit "14", the same being a graph illustrating the survey for flood control and focalizing on stream bed changes at San Marcial, and which shows, first, the change of the stream bed at San Marcial in feet; secondly, the elevation of the reservoir in mean feet above sea level, and stream discharge in acre feet per month, indicates clearly that there is no correlation between the reservoir elevation, the change of stream bed and the stream discharge in acre feet per month.

Attention is focused on this exhibit for the reason that each side seems to gather some comfort therefrom. Comparing it with all of the other exhibits, viewing it together with defendant's exhibit "A", which is an aerial photographic mosaic of the area in question, flown in the year 1935, leaves the distinct conviction with the Court, that the erection of the Dam and filling of the Reservoir were not the competent producing causes of the floodings of San Marcial in 1929.

■■ The burden of proof, of course, lies upon the claimants to establish by a preponderance of the evidence, that the Elephant Butte Dam and Reservoir proximately caused the flooding of the lands of the claimants. At or near the time of the floods of August and September 1929, the area on which San Marcial was located varied between six and seven feet below the bed of the Rio Grande. During the months of August and September, 1929, there were heavy rains in practically all of the Rio Grande area, and particularly in the tributaries of the Rio Puerco and the Rio Salado. This magnified the silting process, and a ter-

rific amount of water was carried past the site of San Marcial.

At this time it should be mentioned, there were floods on about August 12th and 13th, 1929, and again on September 29th, 1929. After the August floods, the waters receded, and it would be assumed that large deposits of silt were made on the river bed. Conditions were such, however, that no precise measurements could be made, and we are without precise statistical data in that regard.

Arroyos to the west of San Marcial drained water into the town and up against the dikes between the town and the river. The residents of the town cut through the dikes in the southwesterly part of town, to allow drainage therefrom of the accumulated Arroyo waters. This was after the August floods. When the September floods came, the water pierced these holes, and the dike failed at several points further north of this site. The town was virtually destroyed by the September 29th flood, and the town was abandoned and is a practically impenetrable swamp at this time.

Viewing the hydraulic and geological expert testimony as a whole, it appears that it has not been established that any causal connection existed between the flooding of San Marcial and the erection of the Elephant Butte Dam and Reservoir. The evidence of both plaintiff and defendant experts, all of whom were outstanding in their fields, is clearly set forth in the record, and little would be achieved by a detailed recitation thereof.

The Court has consulted transcripts of portions of the testimony, has re-read, studied and evaluated its rather copious trial notes, and has reviewed each of the exhibits, and has come to the ultimate conclusion, which has been several times above reflected, that the claimants have not established liability on the part of the United States of America, under the Fifth Amendment, or otherwise, for the damage to the several properties herein involved. Private property is not to be lightly regarded, and the sovereign should be held to a strict accountability for any taking thereof, or damages resulting to private property. The Special Act first referred to, has this philosophy in mind, and the Court has been ever cognizant of its responsibility toward private owners since the inception of this case. Damage without responsibility of the Government, however, is not an element which this Court can consider.

After considering all of the plaintiff's evidence and reasonable inferences to be drawn therefrom, the Court is of the considered opinion that the burden of proof herein has not been met. Specific Findings of Fact and Conclusions of Law are hereinafter set forth, but the Court desired this method as a preliminary step to consolidate and formulate its eventual Decision herein.

It will be necessary that a Judgment be presented to this Court by August 15, 1960, inasmuch as the author of this Decision is departing on an extended trip. If a suitable Judgment is not presented, the Court will effect the entering of a docket entry in conformity herewith. Each party should bear his own or its own costs in the matter.

Findings of Fact

The Court finds, as a matter of fact:

1. That plaintiff is a citizen and resident of New Mexico, and that he is the same Charles H. Nattress, Sr., named in Private Law 767, 84th Congress, Chapter 609, 2d Session, (July 14, 1956), which confers jurisdiction upon this Court to " * * * hear, determine, and render judgment upon the claims of * * * (plaintiff and others named) * * * against the United States for compensation for the taking of or for damage to real or personal property in the flooding of lands in the Rio Grande Valley in the vicinity of San Marcial, New Mexico, in 1929, which flooding allegedly resulted from the construction by the United States of Elephant Butte Dam on the Rio Grande."

2. In 1929 and at all times material hereto, the plaintiff was the owner of an undivided one-half interest in lots 9, 10, 11 and 12, block 5, as shown on a certain map of the New Town of San Marcial,

New Mexico, made by W. S. Pratt and filed with the Recorder of Deeds of Socorro County, New Mexico, August 28, 1882, and was the owner of lots 15 and 16, block 9, New Town, San Marcial, as shown on the same map, together with certain improvements and personal property thereon.

3. Pursuant to the authority contained in the Act of February 25, 1905, 33 Stat. 814, the United States constructed a dam on the Rio Grande at Elephant Butte, New Mexico, approximately 42 miles south of San Marcial. The dam was placed in operation on January 6, 1915, when the gates were closed, and it began to impound water in Elephant Butte Reservoir.

4. The defendant acquired by purchase or condemnation various tracts of land and flowage rights for the reservoir area which extended for approximately 42 miles from Elephant Butte Dam to a point just south of San Marcial. None of the lands or flowage rights acquired included any of the plaintiff's lands or property.

5. The plaintiff contends that as a direct result of the construction and operation of Elephant Butte Dam and Reservoir the silt and sediment carried by the Rio Grande were caused to be deposited at the northerly end of the reservoir in such a manner as to form a delta which altered the grade of the river and caused it to build up its bed or aggrade and thus to retard or block the downstream movement of water and sediment. The plaintiff further contends that by the year 1929 the grade of the river near San Marcial had been so altered and the downstream movement of surface and ground water had been so retarded that sediment deposited at an accelerated rate in the vicinity of San Marcial. The plaintiff further contends that the water from the river which could have been carried downstream without damage to adjacent lands backed up and in August and September 1929 overflowed the bank of the river on to the lands of the plaintiff.

6. The Rio Grande is essentially a clear stream from its source in the Colorado mountains down to its junction with the Rio Chama in northern New Mexico. From that point downstream it carries an increasing load of sediment, large portions being contributed by the Rio Chama, the Rio Jemez, the Rio Puerco and the Rio Salado. The sediment brought into the Rio Grande by the tributaries, the Rio Puerco and the Rio Salado being the largest contributors, arrives during the summer flash floods in the tributaries when the Rio Grande is carrying very little water from its source. Because the river is carrying so little water at that time of the year, the sediment burden deposits in the Rio Grande at the mouth of each tributary in alluvial, fan-shaped formations and remains there until the next flow occurs on the main river when part of it may be moved along downstream. This usually occurs during the spring run-off.

7. The natural historic, climatic and geologic conditions of the area through which the Rio Grande meanders from its source in Colorado to Elephant Butte Dam and Reservoir have caused it to be a heavy silt and sediment-carrying stream. It is, in fact, one of the heaviest sediment-carrying streams in the United States. Because of the heavy sediment load, it is a naturally aggrading stream and has been aggrading for many centuries.

8. Prior to about 1880, each of the tributaries was characterized by a channel and a flood plain. The flood plains were covered with vegetation but beginning about 1885, a period of accelerated channel erosion or gullying commenced. The channels of the tributaries were greatly deepened and broadened and the increased tributary erosion has been a major source of increasing sedimentation in the main channel of the river.

9. At about the same time that the increased erosion of the tributaries occurred, a period of increased aridity, increased grazing and increased use of irrigation for agriculture also commenced.

This increased aridity and increased grazing tended to remove the soil cover and also accelerated erosion. In addition, between 1880 and 1915 as much as one half of the flow of the river was removed for irrigation. The reduced volume of water available to transport the increased sediment burden thus accelerated deposition and consequent aggradation.

10. In 1880 the predecessor of the Atchison, Topeka and Santa Fe Railway Company constructed an embankment and railroad right of way along the west bank of the Rio Grande between the town of San Marcial and the river. Since that time the Atchison, Topeka and Santa Fe Railway Company has maintained that embankment for its railroad bed, has made several raises in the embankment and has constructed dikes or levies to protect the embankment from the waters of the Rio Grande.

11. As early as 1912 the town of San Marcial constructed a community dike at the south end of the town to protect itself from the rising river bed. By 1914, other dikes or levies were constructed near Val Verde and drainage ditches were placed in operation to drain off seepage water in the town of San Marcial.

12. The construction and maintenance of the railroad embankment and the dikes and levies caused an unnatural constraint upon the river by constricting its one to two mile-wide flood plain to the narrow 850 to 1200-foot opening at railroad Bridge 1005–A and subsequently Bridge 1006–A. The constriction prevented the river from achieving its natural development and adapting the land forms and channel configurations which it ordinarily would have sought. The river, being confined to a narrow channel, was prevented from meandering back and forth across the entire river valley. The dikes and levies thus constituted an impediment to the flow of the river and resulted in the deposition of sediment upstream from the constriction. In addition, as the river escaped through the narrow opening under the bridges, it spread out across the entire valley below Bridge 1005–A and subsequently Bridge 1006–A. It then became shallower and deposited its sediment in an alluvial, fan-shaped deposition immediately south of San Marcial.

13. In order for a delta to form at the head of a reservoir, the level of the reservoir must remain fairly constant for a sufficient period of time. When, due to low water conditions, the level of the reservoir retreats below a delta which may have formed, the sediment constituting the delta is scoured and washed downstream by subsequent flows to the adjusted location of the head of the reservoir. Elephant Butte Reservoir from the time of its creation in 1915 has been characterized by gradual fillings, extended withdrawals to low levels and further fillings and withdrawals. The head of the reservoir has never remained constant in one location for any considerable period of time. In the years prior to 1929, the head of Elephant Butte Reservoir has ranged from five to 35 miles below San Marcial. Most of that time it has been 15 to 20 miles downstream from San Marcial except for the high water years 1920, 1921 and 1924 when it has been within approximately five miles of San Marcial. Any deposition of sediment at the head of the reservoir when it was within five miles of San Marcial therefore was washed downstream by subsequent flows as the reservoir receded and a delta never had an opportunity to build back upstream or to exert a significant backwater effect upon the river as far upstream as San Marcial.

14. Surveys of the river valley across certain predetermined range lines or survey lines, and as shown by cross-sections and profiles plotted from such surveys, established that between 1914 and 1922 the deposition which occurred both in the vicinity of the lake below Old Fort Craig and in the vicinity immediately south of the town of San Marcial near railroad Bridge 1006–A was not continuous. While the deposition at both the head of the lake and the area just south of San Marcial showed an accumulation of two

to three feet during those years, the deposition at range line AA, which is intermediate between Old Fort Craig and San Marcial, consisted of no more than six tenths of a foot. Therefore, not only did the delta which may have formed at the head of the lake not extend continuously to San Marcial but it could not have exerted a continuous effect upon the flowing sediment-carrying water in the river as far upstream as San Marcial.

15. Instead, the deposition which occurred at the south end of San Marcial was due to the increasing sediment burden previously described and to the narrow constricted channel and by water and silt overflowing from the new channel which the river assumed in 1922. It was not due to back water effect or back filling from the head of Elephant Butte Reservoir.

16. Between January 1, 1895, and January 6, 1915, when the gates at Elephant Butte Dam were closed, the bed of the Rio Grande near San Marcial aggraded at the average annual rate of .216 of a foot per year for a total of 4.32 feet in that 20-year period. If that average annual rate of aggradation had continued, by October 1929 the bed of the Rio Grande near San Marcial could have been expected to have aggraded an additional 3.20 feet. As a matter of fact by October 1929 the bed of the river had aggraded only 2.83 feet, or one-third of a foot less than the amount which could have been expected even if Elephant Butte Dam had never been built.

17. The reports of the State Engineer of the State of New Mexico, other records, and the testimony of witnesses, including the plaintiff himself, established without question that the floods of August and September 1929 were the greatest floods in the recorded history of the Rio Grande in that vicinity. Those floods were caused by unusually heavy storms over the watersheds of the Rio Puerco and Rio Salado. Thousands of acres of land in the entire river valley from San Acacia all the way downstream to San Marcial were inundated by the river. Many floods had occurred in the area of San Marcial for many years before Elephant Butte Dam was placed in operation and before 1929 when the plaintiff's property was inundated. The records of the State Engineer for New Mexico and the records of the Corps of Engineers show that the second largest flood in recorded history occurred in 1904, 11 years before Elephant Butte Dam was placed in operation. In that year, as well as in 1920 and 1924, the town of San Marcial was inundated. The floods of 1929 were of such magnitude that San Marcial would have been inundated even if Elephant Butte Dam and Reservoir had not been built.

18. The construction and operation of Elephant Butte Dam and Reservoir, therefore, did not cause any measurable aggradation of the river bed at San Marcial and did not cause the flooding of plaintiff's property in 1929.

Conclusions of Law

The Court concludes, as a matter of law:

1. By the Act of July 14, 1956, 70 Stat. A121, jurisdiction was conferred upon this Court to "hear, determine, and render judgment upon the claims of" the plaintiff in this case and the plaintiffs in the cases entitled G. E. Baca et al. v. United States, Civil No. 333, Pablo Alderete et al. v. United States, Civil No. 3456, and Jose A. Gutierrez et al. v. United States, Civil No.3575, and Petrocinio Trujeque et al. v. United States, Civil No. 4206, "for compensation for the taking of or for damage to real or personal property in the flooding of lands in the Rio Grande valley in the vicinity of San Marcial, New Mexico, in 1929, which flooding allegedly resulted from the construction by the United States of Elephant Butte dam on the Rio Grande."

2. There was no causal connection between the construction and operation of Elephant Butte Dam and the flooding in 1929 of plaintiff's property.

3. The construction of Elephant Butte Dam by the United States in 1915 and the operation of its reservoir since that time did not result in the taking of

or damage to any real or personal property of the plaintiff.

4. The plaintiff in this case and all of the plaintiffs in the related cases described above are represented by the same counsel. By virtue of agreements between counsel for the plaintiffs and counsel for the defendant and with the approval of the Court the present action was tried on the sole issue of liability and is to be considered a test case" and all of the related cases are to be governed by the decision as to liability in this case.

5. The Court concludes as a matter of law that the United States is not liable to the plaintiffs for a taking of or for damage to their property. The plaintiffs therefore are not entitled to recover.

6. Each party shall bear his or its own costs.

7. The Court has drafted, signed and had entered, a Judgment in conformity herewith.

To all of which plaintiff objects and excepts.